FILED
01/17/2025
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 1, 2024

**IN RE TAIDEN B.**

**Appeal from the Circuit Court for Putnam County**
**No. 2023-CV-129    William Talley Ridley, Judge**

_____

**No. M2024-00101-COA-R3-PT**

_____

In this action to terminate parental rights, Mother appeals the trial court's findings by clear and convincing evidence that she abandoned her child and that the termination of her parental rights was in the child's best interest. The evidence does not preponderate against the trial court's determination. Therefore, we affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which CARMA DENNIS MCGEE and KRISTI M. DAVIS, JJ., joined.

Stephanie Limbaugh Nolan, Cookeville, Tennessee, for the appellant, Haley B.

Jonathan Skrmetti, Attorney General and Reporter, and Kathryn A. Ahillen, Deputy Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND[1]

Taiden B. was born in January 2021 and is the biological child of Haley B. ("Mother") and Jaqualyn P., the child's putative father ("Father").[2] In September 2021, the Department of Children's Services ("DCS" or "the Department") received a referral alleging that Taiden did not have proper care and supervision and had been exposed to

---

[1] We note that Mother's counsel failed to include a statement of the facts in her appellate brief, as required by Tenn. R. App. P. 27(a).

[2] At the time of Taiden's birth, Mother was married to Brandon B., the child's legal father, who subsequently executed a denial of paternity and is, therefore, not a party to this action. The putative father, Jacqualyn P., surrendered his parental rights to the child on August 10, 2023.

domestic violence. The Department attempted but was unable to contact the family at the address provided, which was incorrect or no longer current. A few weeks later, the Department received a second referral with similar allegations and was unable to locate the family at a second address. The DCS case manager reached the child's grandmother, who reported that Mother had been evicted and was living at a motel. The grandmother expressed her concern that Mother was a victim of domestic violence perpetrated by Father.

At the end of October 2021, DCS located Mother and Taiden at a motel. Mother had a black eye and bruises on her arms that appeared to be at various stages of healing. Mother denied that Father had ever hit her; she maintained that she bruised easily and that the bruises occurred at work. Further, Mother stated that Father's ex-girlfriend gave her the black eye during an altercation between the two women. Mother denied the referral's allegation that Father had threatened her with a gun. In response to the case manager's inquiry about the family's needs, Mother admitted that she had been evicted but declined any assistance from the Department.

The Department received a third referral in November 2021 alleging a lack of supervision and exposure of Taiden to drugs. Mother gave temporary legal custody of the child to his paternal grandmother, Tabatha R. Ms. R. permitted the Department to conduct a hair follicle drug screen on Taiden, and the results were positive for methamphetamine. The Department scheduled hair follicle drug screens for Mother and Father, as well as Ms. R. and her husband, on December 20, 2021. On December 19, 2021, Mother revoked the grant of temporary custody to Ms. R., and none of the adults appeared for the drug screens.

The Department filed a dependency and neglect petition on December 28, 2021, requesting that the juvenile court enter a protective supervision plan and restrain the parents' conduct, and the court entered an order leaving Taiden in the custody of Mother under the Department's protective supervision. On December 31, 2021, Father was arrested for aggravated assault; on January 2, 2022, Mother was arrested for theft of property and remained incarcerated until January 12, 2022. At the time of Mother's arrest, Taiden was in the care of Ms. R. Shortly thereafter, Ms. R. notified DCS that she no longer wanted to care for the child, and the Department took custody of the child under exigent circumstances. The juvenile court adjudicated Taiden dependent and neglected in August 2022, and he remained in DCS custody.

After DCS took custody of Taiden, Mother was incarcerated multiple additional times on various criminal charges: June 24, 2022, for criminal simulation; August 4, 2022, for violation of the Meth-Free Tennessee Act; October 17 through 27, 2022, on a capias for failure to appear, violation of the Meth-Free Tennessee Act, criminal simulation, and casual exchange; and November 29 through 30, 2022, for manufacturing, delivery, or sale of a controlled substance. In March 2023, Mother was arrested in South Carolina for theft and resisting and hindering arrest. She was extradited to Tennessee and remained

incarcerated until August 21, 2023, when she was court-ordered into drug treatment in lieu of incarceration.

On May 15, 2023, the Department filed a petition for termination of parental rights alleging three grounds for termination: (1) abandonment by an incarcerated parent for failure to support, (2) abandonment by wanton disregard, and (3) failure to manifest an ability or willingness to assume custody. At the hearing on September 28, 2023, the Department nonsuited the first ground. The court heard testimony from Mother; the DCS case manager, Kaylee Pritchett; and both foster parents.

Proof at trial

Mother testified that Taiden's maternal and paternal grandmothers took care of Mother and Taiden while Father was in and out of jail. When Taiden went into DCS custody, Mother was not employed. She testified about various jobs but did not provide details about the length of employment; she estimated that she made about twelve dollars an hour at several of the jobs. Two of the jobs were at motels where Mother's rent would be taken out of her paycheck. Mother acknowledged that, based upon her income, she had been ordered to pay child support of $100 and, later, $50 a month. She testified that she could not remember whether she ever paid any child support and that she was uncertain whether it was ever taken out of her paycheck.

Mother admitted having used drugs in the past but denied using drugs after Taiden's birth; rather, she insisted, "I was around them [drugs] after I had [Taiden] quite a bit." When questioned further about her drug use, Mother acknowledged that she had tested positive for drugs in March 2023 but emphasized that "there was a faint line" on the drug screen and that the results were negative when she was tested two days later. As to a hair follicle test in January 2023 that showed methamphetamine use, Mother explained that she was living at a motel where people were using methamphetamine at that time, but she did not use the drug. Mother testified that she completed an alcohol and drug assessment for the Department but had not attended the recommended intensive outpatient treatment program ("IOP") due to transportation issues.

Mother admitted that she had not completed all of the anger management and parenting classes offered by DCS, citing her work schedule, transportation problems, and time spent in jail. In August 2023, Mother was court-ordered into a year-long multi-stage drug treatment program, and, at the time of trial, she had recently stepped down to a sober living facility. As part of the sober living placement, Mother had started a job making $16.79 an hour in August 2023, and she expected child support to be taken out of her paycheck. She was also completing classes and counseling as part of the recovery program and testified that she would complete the program on August 21, 2024. At that point, Mother would be back on probation for another four or five years.

Mother acknowledged that it would be another ten months before she would be able to assume custody of Taiden. Mother expressed an understanding of the impact taking Taiden from his foster parents would have on the child as she had been through a similar separation from her own mother.[3] Although she acknowledged that she had chosen to violate probation knowing that her child was in foster care, Mother testified that she was now making progress toward reunification and was more financially stable and ready to take care of her child. Mother further testified that she was no longer involved with Father and would no longer be engaging in criminal behavior.

Kaylee Pritchett, Taiden's case manager, testified that she reviewed the criteria for termination of parental rights with Mother on several occasions and that Mother had signed the document in February 2022. Ms. Pritchett provided Mother with available services: an alcohol and drug assessment, an IOP, a psychological assessment, in-person and virtual parenting classes, transportation services, housing and employment information, anger management classes, and supervised visitation. According to Ms. Pritchett, Mother failed to take advantage of most of these services and continued to make choices that were not in the child's best interests, including repeated incarcerations and maintaining a relationship with Father, whom Mother had described as being verbally and emotionally abusive. Ms. Pritchett stated that Mother was discharged from the IOP for noncompliance and had completed the IOP only after it was court-ordered.

Ms. Pritchett attempted on multiple occasions to drug screen Mother. Mother was never able to provide a urine specimen, even after a two-hour visit with Taiden. The Department tried to perform hair follicle testing on five occasions before Mother completed one in January 2023, which was positive for methamphetamine. In March 2023, Mother failed a urine drug screen for methamphetamine and, therefore, was arrested on a violation of probation.

Prior to her March 2023 arrest, Mother participated in supervised visitation with Taiden. Ms. Pritchett supervised most of Mother's visits, and Mother would interact and engage with Taiden. Based upon her observations at those visits, Ms. Pritchett testified that "it does not appear there's as much of a bond there [with Mother] as there is with the foster parents." At the beginning of Taiden's time in DCS custody, he sometimes became upset when the visit with Mother ended. More recently, however, Ms. Pritchett had not

---

[3] The following exchange occurred between counsel for DCS and Mother:

Q. Okay. I want you to try to place yourself in your child's position. You're this child's mother. You probably know him better than anybody. What do you think it's going to do to him to be taken from the people that he knows, the only consistency and stability he's had for almost two years now and he's almost three years old and placed with you?
A. I was once that child. I know how he feels. I know exactly what he is going through. I always questioned why my mama didn't fight for me.

seen him distressed or upset; he "usually will run to his foster moms and be ready to go with them."

Ms. Pritchett stated that Taiden was well cared for in the foster home and had bonded with the foster parents. She opined that there would be a substantial risk of harm to his emotional welfare if he were to be taken from the foster home and returned to Mother.

### Trial court's decision

In a final order entered on November 20, 2023, the court found that the Department had proven, by clear and convincing evidence, that (1) Mother had abandoned Taiden by engaging in conduct prior to incarceration showing a wanton disregard for the child's welfare, and (2) the termination of Mother's parental rights was in the best interest of the child. With respect to the other remaining ground asserted by the Department, failure to manifest an ability and willingness to assume custody, the court could not find "by clear and convincing evidence that returning the child to [Mother] would pose a risk of substantial harm." Therefore, the court concluded that the Department had not proven this ground.

On appeal, Mother challenges the trial court's determination that her conduct during the relevant time period constituted wanton disregard. She also argues that the trial court erred in finding that termination was in the child's best interest.

### STANDARD OF REVIEW

Our Supreme Court has found "that both the United States and Tennessee Constitutions protect parents' rights to the custody and care of their children." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This interest has been said to be "'far more precious than any property right.'" *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). Although this right is fundamental, parents may forfeit it by conducting themselves in ways that substantially harm their children. *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010). Before a court terminates a parent's rights to a child, it must be shown that the parent is unfit or that the child will suffer substantial harm if the parent's rights are not terminated. *In re Adoption of A.M.H.*, 215 S.W.3d at 809 (citing *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999)). The Tennessee legislature has established the methods and procedures by which parental rights may be terminated. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Petitioners must show clear and convincing evidence that at least one of the enumerated grounds found in the statute exists and that terminating the parent's rights is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013). On appeal, reviewing courts must determine on their own accord whether the facts, "either as found by the trial court or as supported by a

preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524.

We review findings of fact de novo upon the record with a presumption of correctness unless the preponderance of the evidence indicates otherwise. TENN. R. APP. P. 13(d); *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). The petitioner must prove both steps of the termination process by clear and convincing evidence. *In re Angela E.*, 303 S.W.3d at 250. "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

ANALYSIS

I.     Abandonment by wanton disregard

Mother asserts that the trial court erred in finding that she abandoned her child by exhibiting a wanton disregard for the child's welfare.

A. Relevant time period

Mother first argues that the trial court failed to give her notice of the "relevant time period of the [wanton disregard] allegations" against her, thereby rendering the termination procedure "grossly unfair." Under Tenn. Code Ann. § 36-1-113(g)(1), a parent's rights may be terminated for abandonment, as defined in Tenn. Code Ann. § 36-1-102. The relevant definition of abandonment provides that a parent abandons a child when:

> A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:
> . . .
> (*c*) With knowledge of the existence of the born or unborn child, engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv)(*c*).[4]

---

[4] We apply the statutes in effect when the termination petition was filed on May 15, 2023. Some of Mother's arguments reference later versions of the statutes, which are not applicable to this case.

Mother correctly states that the petition alleges "only that Mother was incarcerated in the four (4) months prior to the filing of the Petition." No additional time frame is required under the statute. The relevant language of Tenn. Code Ann. § 36-1-102(1)(A)(iv) makes the provision applicable to a parent incarcerated "at the time of the filing of a proceeding" or a parent who "has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action." There is no dispute that Mother was indeed incarcerated during part of the four months prior to the filing of the petition. Therefore, she falls within the category of parent to whom Tenn. Code Ann. § 36-1-102(1)(A)(iv) applies. Mother further emphasizes that the trial court's findings did not include a "specific time frame for the determination of the wanton disregard ground." The relevant statutory language requires only that the parent's conduct occurred "prior to, during, or after incarceration" and "exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv)(*c*). Therefore, the trial court was not required to name a specific time period for the conduct that exhibited a wanton disregard.

While acknowledging that the wanton disregard ground does not delineate a time period during which the conduct exhibiting a wanton disregard occurred, Mother essentially argues that, because of the importance of the rights involved, the statute should be interpreted to require notice of an applicable time period. Otherwise, she warns, the Department can choose any time period "to best defeat the parent." Mother asserts that this alleged lack of notice "renders the procedure in this termination proceeding grossly unfair." Mother provides no authority for this position other than emphasizing the importance of the constitutional rights involved.

We see no constitutional deprivation in the application of the wanton disregard ground to Mother. This ground "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child." *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). Yet, because "parental incarceration is not an infallible predictor of parental unfitness," subsection (c) of Tenn. Code Ann. § 36-1-102(1)(iv) "does not make incarceration alone a ground for the termination of parental rights." *Id.* Rather, the incarcerated parent can be found to have abandoned a child only if the court finds by clear and convincing evidence that the parent's conduct "prior to, during, or after incarceration . . . exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(iv)(*c*); *see also In re Audrey S.*, 182 S.W.3d at 866 (addressing the wanton disregard ground with respect to a previous version of this subsection). The parent's incarceration acts as a "triggering mechanism that allows the court to take a closer look at the child's situation" to determine whether there is a "broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866.

Moreover, in this case, there is no ambiguity in the relevant time period with respect to the wanton disregard analysis. The proof at trial and the trial court's decision focused upon the period of time after Taiden was taken into DCS custody. At the time of trial, Mother remained under the limitations of a drug treatment program that she was required to complete in lieu of incarceration. Mother was not at any disadvantage in terms of knowing the period during which her conduct would be examined. Contrary to Mother's suggestion, the Department could not choose to focus upon any conduct of Mother's from any time period prior to her incarceration.[5] In any case in which this ground applies (based upon the parent's incarceration), the Department must prove that the parent's conduct was done with knowledge of the child's existence and exhibited a wanton disregard for the child's welfare.

## B. Proof of wanton disregard

Mother also argues that there was insufficient proof that Mother engaged in behavior exhibiting a wanton disregard for her child.

In determining that the Department had proven this ground by clear and convincing evidence, the trial court made the following findings of fact:

> 9. . . . The Court heard testimony from [Mother], and found her testimony to be extremely sincere in her desires and wishes and hope for reunification, but did not find her testimony credible when it came to remembering events or being forthcoming about things in the past two years.
> 10. The Court particularly notes when looking at wanton disregard, the criminal acts of [Mother]. It is important to note that [Mother] was incarcerated when the petition was filed on May 15, 2023, and had been incarcerated since March 27, 2023. She remained incarcerated until after the filing of the petition through August 21, 2023. At the present time, she is in a facility where she is not incarcerated but she is not allowed to leave. This facility is in lieu of being incarcerated and she cannot just walk out of the door.
> 11. [Mother] was also in jail on December 1, 2023. She was in jail for two days on November 29 and 30, 2022. She was in jail for ten days from October 17, to 27, 2022. She was in jail for one day on or about August 22, 2022. She was again in jail for one day on June 24, 2022. Then there was a period of time from January 6, 2022 through January 12, 2022, when she was in jail. The Court finds that [Mother] has been incarcerated multiple times

---

[5] Mother seems to be proceeding under a prior version of Tenn. Code Ann. § 36-1-102 that limited the conduct to the time prior to incarceration. However, as quoted above, the applicable statute references conduct prior to, during, and after the parent's incarceration.

over less than two years. This frequent incarceration shows a wanton disregard for the child. It would be difficult to argue that [Mother] has been falsely accused and arrested that many times in such a short period of time.

12. When asked directly about whether or not she was thinking about her child during the time she was in and out of jail, she said she did not know and/or could not remember. This tells the Court that [Mother] was not thinking about the child at that time.

13. [Mother] had some temporary jobs and made $12 per hour at one of those jobs, although it is uncertain as to how many jobs and how long those lasted, if they lasted at all. [Mother] was ordered to pay $100 per month in child support and then that was reduced to $50 per month. She made one child support payment of $69.23 which is token support, and this weighs in the Court's decision.

14. One of the ways to show concern for the child would be to support the child financially, to visit the child, or to behave in a way that would result in reunification.

15. [Mother] was given notice of what a termination of parental rights proceeding consisted of and ways in which the Department could seek to terminate her parental rights.

. . .

17. Despite having knowledge of the Criteria and Procedures for Termination of Parental Rights all the way back in January of 2022, [Mother] chose instead to live a life of crime and drug use. She was arrested for criminal simulation. She failed a hair follicle drug test. There were three attempts to get a hair follicle drug test from [Mother] and none of those attempts were successful because she would not participate.

18. [Mother] was provided an alcohol and drug assessment, in which she participated, and she was recommended to attend intensive outpatient treatment. She did not follow that recommendation.

19. [Mother] did not take advantage of other services, citing lack of transportation. Then she admitted that she was aware of public transportation services that were available to her, she just did not use those services.

20. [Mother] completed intensive outpatient treatment and has made some strides in the last few months. However, for the majority of this time period she exhibited a wanton disregard for the welfare of the child.

Mother asserts that "there was a paucity of proof at trial indicative of continued drug use." We cannot agree with this characterization of the proof in the record. Mother relies largely upon her own testimony that "she was free of drugs at the time of the filing of the Petition For Termination of Parental Rights and the time frame immediately prior to it." However, the trial court did not find that testimony credible, and we will defer to the trial court's credibility determinations absent clear and convincing evidence to the contrary. *In re Mia C.*, No. E2023-00828-COA-R3-PT, 2024 WL 4003297, at *16 (Tenn. Ct. App. Aug.

30, 2024). Mother attempts to reject the positive hair follicle drug test results in March 2023 as reflecting an earlier period in time because she was "surprised at the positive result." She further dismisses Ms. Pritchett's unsuccessful attempts to obtain further drug tests based upon the lack of proof that these attempts were in the "applicable time period." As discussed above, the relevant statutory language does not limit the relevant conduct to a specific time period. Ms. Pritchett's testimony provided the court with strong evidence of Mother's continued drug use. Moreover, the trial court made factual findings concerning other evidence of Mother's wanton disregard, including repeated incarcerations, violating probation, and failure to support. *See In re Audrey S.*, 182 S.W.3d at 867-868 ("We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child.").

The evidence does not preponderate against the trial court's determination that the Department established this statutory ground for termination by clear and convincing evidence.

II.     Best interest determination

Mother also argues that the trial court erred in finding that termination was in the best interest of the child.

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Mother's parental rights, we must next consider whether the trial court properly determined that termination of Mother's parental rights was in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent, and the court focuses on the child's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A court must view the child's best interest from the perspective of the child, not that of the parent. *Id.* at 878. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* at 877. Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

When considering whether terminating a parent's rights to a child is in the child's best interest, a trial court must consider the factors enumerated in Tenn. Code Ann. § 36-

- 10 -

1-113(i). A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Although in some circumstances "the consideration of one factor may very well dictate the outcome of the analysis," *In re Audrey S.*, 182 S.W.3d at 878, a court is still obligated to consider "all the factors and all the proof." *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017).

In its order, the trial court carefully evaluated the statutory factors and found that, overall, they favored terminating Mother's parental rights. The court made the following findings of fact:

25. Pursuant to Tenn. Code Ann. § 36-1-113(i)(A), the effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority. The Court finds that Ms. Pritchett has observed the child in the current foster placement. The child is excelling and refers to the foster parents in endearing manners. The child goes to the foster parents when necessary to meet his needs. The foster parents pay for those needs. The foster parents in this case . . . both testified, and the Court found their testimony credible. Each testified to their love and affection for the child. They spoke of the child having some developmental needs. They also testified that the child has an older brother and two older sisters in the foster home with whom the child is well bonded. The foster parents would like to adopt the child if the child were to be available for adoption. They get the child ready in the morning, take him to day care, and provide for his needs. The Court finds that termination of parental rights will have a positive impact on the child's critical need for stability and continuity of placement through the child's minority. He has stability in his foster home. The child has never had stability with his biological mother and there is no proof that the child could have stability with his biological mother for at least another ten months. This factor weighs in favor of termination of parental rights.

26. Pursuant to Tenn. Code Ann. § 36-1-113(i)(B), the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition, the Court finds that a change in caretakers and physical environment is likely to have a negative impact on the child's emotional, psychological, and medical condition. The child has been with the same foster parents for a year. Any change in the child's caretaker and physical environment is likely to disrupt his emotional well-being. There is nothing in the record about psychological or medical conditions, but overall this factor weighs in favor of termination of parental rights.

27. Pursuant to Tenn. Code Ann.§ 36-1-113(i)(C), whether the parent has demonstrated continuity and stability in meeting the child's basic material,

educational, housing, and safety needs, the Court finds that the foster parents are meeting all of the child's needs. Conversely, [Mother] has not demonstrated any stability throughout the child's entire life and this factor weights in favor of termination of parental rights.

28. Pursuant to Tenn. Code Ann. § 36-1-113(i)(D), whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment, there is really no proof of any parental attachment. [Mother] testified that the child called her "Mom" previously but is no longer doing so. [Mother] testified that she observed the child calling the foster parent "Mama" in one of her visits. The Court believes that the mother could create a secure and healthy relationship with the child at some time in the future; however, that is at least ten months from today. This factor weighs against termination of parental rights.

29. Pursuant to Tenn. Code Ann. § 36-1-113(i)(E), whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child, [Mother] has had some visitation with the child; however, there was a long period of time when there was no visitation while [Mother] was in and out of jail. This factor weighs in favor of termination of parental rights.

30. Pursuant to Tenn. Code Ann. § 113(i)(F), whether the child is fearful of living in the parent's home, the Court finds that the child is too young to express any fears and there is no testimony in the record concerning that.

31. Pursuant to Tenn Code Ann. § 113(i)(G), whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms, the Court makes the same finding as the previous factor in that the child is too young and this factor does not apply in this case.

32. Pursuant to Tenn. Code Ann. § 113(i)(H), whether the child has created a healthy parental attachment with another person or persons in the absence of the parent, the Court finds that the child has created a healthy parental attachment with others. The proof is obvious that the child has bonded well with the foster parents. In fact, [Mother] requested that her lawyer express her thankfulness for their love and support. Even [Mother] acknowledges the bond between the foster parents and the child. This factor weighs in favor of termination of parental rights.

33. Pursuant to Tenn. Code Ann. § 36-1-113(i)(I), whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage, the Court finds that there was no information about the child's heritage, but there was testimony that the child has other foster siblings, two sisters and a brother, that he is bonded with and

he shares a room with his foster brother. This factor weighs in favor of termination of parental rights.

34. Pursuant to Tenn. Code Ann. § 36-1-113(i)(J), whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner, the Court finds that the child has been in foster care for two years and there has not been any real progress until this last month. Even with this progress, [Mother] is still ten months away from completing her program. This factor weighs in favor of termination of parental rights. There has been criminal activity in the home of and by [Mother] that has resulted in multiple arrests of [Mother] over the past two years. There is no testimony that [Mother] uses alcohol, but she has been charged and pled guilty to several crimes involving the use of controlled substances. This factor weighs in favor of termination of parental rights.

35. Pursuant to Tenn. Code Ann. § 36-1-113(i)(K), whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct or conditions, the Court finds that [Mother] had over a year and a half where she could have taken advantage of services and chose not to do so. She claimed lack of transportation, but transportation was available. [Mother] chose to live with a man who was a known criminal, and this resulted in her becoming incarcerated. She focused her lifestyle on herself and not on her child. [Mother] acknowledged this. This factor weighs in favor of termination of parental rights.

36. Pursuant to Tenn. Code Ann. § 36-1-113(i)(L), whether the Department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the Department, the Court finds that the Department has made reasonable efforts to assist [Mother] in making a lasting adjustment. The testimony is that the Department made substantial efforts, more than reasonable efforts, and attempted for over a year to try to allow [Mother] to have access to classes, her intensive outpatient treatment, among other programs of which she failed to take advantage. This factor weighs in favor of termination of parental rights.

37. Pursuant to Tenn. Code Ann. § 36-1-113(i)(M), whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest, the Court finds that this case has been ongoing for two years. There

has been no sense of urgency by [Mother]. The Court is aware of no petitions that were filed in this action or in the Juvenile Court action which made any sense of urgency to regain the child. Not even the basic steps were taken to address the concerns the Department had about [Mother] to begin with. This factor weighs in favor of termination of parental rights.

38. Pursuant to Tenn. Code Ann. § 36-1-113(i)(N), whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult, there is no proof in the record which the Court finds would make that factor apply. This factor does not weigh in favor of termination of parental rights.

39. Pursuant to Tenn. Code Ann. § 36-1-113(i)(O), whether the parent has ever provided safe and stable care for the child or any other child, the Court finds that [Mother] has not provided care for this child. She has not had custody of the child for most of his life, even before his removal. This factor weighs in favor of termination of parental rights.

40. Pursuant to Tenn. Code Ann. § 36-1-113(i)(P), whether the parent has demonstrated an understanding of the basic and specific need required for the child to thrive, the Court finds that [Mother] has not demonstrated any understanding of the basic or specific needs of the child. If she had an understanding of those needs, [Mother] would have provided for them. Yet [Mother] has not provided for any of the child's needs. This factor weighs in favor of termination of parental rights.

41. Pursuant to Tenn. Code Ann. § 36-1-113(i)(Q), whether the parent has demonstrated the ability and commitment to create and maintain a home that meets the child's basic and specific needs and in which the child can thrive, [Mother] lives in a group home where she is ordered to live at this time. She does not have a home or place for the child to live. She does not have any of the child's basic needs met or the ability to meet them for at least another ten months. This factor weighs in favor of termination of parental rights

42. Pursuant to Tenn. Code Ann. § 36-1-113(i)(R), whether the physical environment of the parent's home is healthy and safe for the child, [Mother] does not have a home at all, so this factor does not apply.

43. Pursuant to Tenn. Code Ann. § 36-1-113(i)(S), whether the parent has consistently provided more than token financial support for the child, the Court finds that [Mother] has failed to provide more than token financial support for the child. She has only provided support one time in the amount of $69. The support that she provided was token and was taken out of her check over the two-year period that the child was removed. This factor weighs in favor of termination of parental rights.

44. Pursuant to Tenn. Code Ann. § 36-1-113(i)(T), whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care

and supervision for the child, there is no testimony about [Mother's] mental or emotional status and this factor does not apply.

Based upon all of these factual findings, the trial court found that the Department had proven by clear and convincing evidence that termination was in the best interest of the child.

On appeal, Mother makes only one challenge to the trial court's findings—namely, that the trial court "did not elucidate the relevant time period for its [best interest] analysis." She asserts that this "lack of notice" justifies reversal of the trial court's decision. Mother cites no authority to support this contention, and the plain language of the statute, Tenn. Code Ann. § 36-1-113(i), does not require any specific time frame for the best interest analysis. In this case, the relevant time period addressed by the proof and by the court was the two years during which the child was in DCS custody. Unfortunately, during these two years, Mother failed to make the changes necessary to allow for the child to be returned to her care.

The evidence does not preponderate against the trial court's factual findings, which provide clear and convincing evidence to support the trial court's best interest determination.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Haley B., for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE